Walter A. Camp and Frieda Camp v. Commissioner. Werner Orbach v. Commissioner.
Camp v. Commissioner
Docket Nos. 37455, 37456.
United States Tax Court
1953 Tax Ct. Memo LEXIS 151; 12 T.C.M. (CCH) 908; T.C.M. (RIA) 53273; August 12, 1953
*151 Shares of stock found to be worthless in 1947. S. J. Pokrass, Esq., 1010 Vermont Avenue, North West, Washington, D.C., for the petitioners. George C. Lea, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income taxes of petitioners for 1947 as follows: Walter A. Camp and Frieda Camp,
husband and wife
$2,395.78
Werner Orbach
$2,201.31
The sole issue presented is whether petitioners, Walter A. Camp and Werner Orbach, sustained deductible losses in 1947 by reason of the common stock of Sheridan Bakery, Inc., becoming worthless in that year. Findings of Fact Walter A. Camp and Frieda Camp, the petitioners in Docket No. 37455, are husband and wife, residing in Washington, D.C. They filed a joint income tax return *152 for the taxable year 1947 with the collector of internal revenue, Baltimore, Maryland. Werner Orbach, the petitioner in Docket No. 37456, resided in Washington, D.C., during the period in question but presently resides in Miami, Florida. He filed a separate income tax return for the taxable year 1947 with the collector of internal revenue, Baltimore, Maryland. On April 1, 1947, petitioners Walter A. Camp and Werner Orbach, both hereinafter referred to as petitioners, entered into a written contract with Harry Mayer for the purchase of all the shares of common stock of Sheridan Bakery, Inc., for the total price of $150,000. Pursuant to that contract on May 1, 1947, the petitioners paid to Harry Mayer on account of the purchase price for the stock the sum of $20,000 and also delivered to him their promissory note in the amount of $130,000. This note was payable in installments, the first semiannual interest payment being due November 1, 1947, and the principal being payable in the amount of the excess of assets over liabilities as of March 31st of each year after audit. To secure the payment of this note, the aforementioned shares of capital stock were held in escrow by Alfred L. Bennett *153 and August L. Lahr, although the petitioners voted the stock. Shortly after purchasing the stock, petitioners became aware that the financial condition of the bakery was very bad and that it could not meet its current obligations. Accordingly, they loaned to the corporation $50,000 which they obtained by selling a piece of property. In return for the loan, the corporation delivered to the petitioners its demand note bearing 4 per cent interest and dated May 12, 1947, in the amount of $50,000. By the middle of June, 1947, it became quite evident to the petitioners that the business was beyond their capacity, that being inexperienced in the bakery business they could not run it properly and that business conditions were so bad that they were losing money at the rate of about $1,000 per week. They immediately began to make genuine efforts to sell the corporation's assets by extensive advertising in trade journals and publications throughout the country. Some 125 letters were written to prospective purchasers and people were shown through the plant. Several trips were made to New York by petitioners in the interest of such a sale. In August, 1947, petitioner Camp attended a bakers' convention *154 in Chicago and approached several people there with a view to making a sale. Out of all these efforts came one offer to buy the corporation's assets in the total sum of $75,000. In October, 1947, a tax lien was filed against the corporation in the amount of $5,882.71 to secure the payment of income taxes due from the corporation for years prior to 1947. During the month of October, 1947, a business conference was held in the office of a Mr. Thompson, an attorney in Washington. The participants were Harry Mayer, from whom the petitioners purchased the capital stock, Thompson, August L. Lahr, the company's certified public accountant, petitioners Camp and Orbach, Alfred L. Bennett, the corporation's attorney, and a stenographer. The purposes of this conference were to discuss the condition of the business, to see what could be done about a sale, and to postpone payment of interest on the $130,000 note due November 1, 1947. All the participants of the conference agreed that the only solution was a sale of the assets and it was decided that the business should continue to operate for the sole purpose of conserving the assets until a sale could be made. On October 27, 1947, five days *155 before the due date of interest on the $130,000 note, Harry Mayer extended the payment to November 30, 1947. In October, 1947, a preferred stockholder named Otto C. Stiefel filed a derivative stockholder's suit in the United States District Court of the District of Columbia, against the corporation and the petitioners, moving the Court, among other things, for the appointment of a receiver pendente lite. Petitioners verbally offered their entire interest in the corporation to Stiefel without any compensation or consideration to themselves and indicated their willingness to step out of the corporation, including their cancelling the $50,000 corporate note as well as making no claim for their original down-payment on the capital stock. On November 8, 1947, petitioner Camp, acting for the corporation, wrote letters to George N. Graf and R. W. McKenzie who were prospective purchasers in which the following paragraphs were included: "You get the following assets (fair valuation, fully supported): "Land, ca 10,000 sq. ft. very desirable location
$ 30,000.00
Modern 2 story concrete building with elevator, just
finished early this year
150,000.00
Machinery, practically all new (3 ovens, etc.)
75,000.00
Trucks (5), four of which practically brand new
13,000.00
Leasehold Improvements incl. complete candy factory fully
equipped
27,000.00
Store Equipment (mostly brand new) for 5 stores with
many extra showcases loaned to accounts
14,000.00
$309,000.00
Current Assets (Cash, Inventory, Acct. Rec. etc.)
40,779.88
Total Fixed and Current Assets
$349,779.88
"You assume the following liabilities: "Mortgage on Building (pay. 675.00 mo.)
$89,201.11
Equipment Notes (to run over 15 mo.)
17,732.03
$106,933.14
Accounts payable - Trade Creditors
$27,927.64
Other Current Liabilities
26,249.11
Preferred Stock
13,000.00
67,176.75
Total Fixed and Current Liabilities
174,109.89
Excess of Assets over Liabilities
$175,669.99
*156 "We can sell you this equity of over $175,669.99 for $130,000.00 if you will make a small cash payment and render a well secured note for the balance, or we can make the price $110,000.00 if you can make a fair cash down payment and make regular payments on a well secured note. In other words we are offering you a going concern doing over $10,000.00 weekly business, charging nothing for goodwill and valuable Trade Mark whatsoever, that is equipped to do $1,500,000.00 yearly business, that includes a modern plant with no equal in the East, the assets of which includes $40,779.88 cash or its equivalent in cash (Cash, Accounts receivable, Inventory, etc.) and with a net worth of $175,669.99 at a discount of from $45,000.00 to $65,000.00 below its cost or replacement value." The appointment of a receiver pursuant to the motion of Stiefel would have nullified a lease under which the corporation was operating which would have resulted in the loss of a valuable asset. That lease provided "that if the said lessee shall fail in business * * * or if a receiver shall be appointed of its property and assets, then upon the happening of any such event, the term hereby demised shall at the option *157 of the lessor, its successors, and/or assigns cease and terminate * * *." Stiefel agreed to the appointment of a managerial committee for the corporation consisting of Harry Mayer and August L. Lahr who for the period prior to and during 1947 acted as auditor for Harry Mayer and the corporation and who was intimately acquainted with its financial affairs. On December 12, 1947 a form letter was sent to the creditors of the corporation pointing out the corporation's financial difficulties and the pending receivership action, and requesting their attendance at a meeting of the creditors on December 17, 1947, at 10:00 a.m., for the purpose of getting their consent to the placing of the management and control of the corporation's affairs in the board of managers and to obtain a 6-month extension for the payment of the creditors' claims. The letter further stated that strenuous efforts would be made to find a purchaser for the business in an attempt to have the creditors paid in full. On December 18, 1947, Stiefel's counsel filed a praecipe with the District Court withdrawing the motion for the appointment of a receiver pendente lite. The withdrawal of that motion was predicated upon a stipulation *158 signed by the attorneys for the respective parties and filed with the Clerk of the District Court on that date wherein it was agreed, among other things, as follows: (1) The duties, rights and obligations of the officers of Sheridan Bakery, Inc., were to be placed in the hands of a board of managers who would operate subject to an advisory committee and whose management would be reviewed at the end of six months by representatives of all interested parties. (2) Walter Camp and Werner Orbach deferred their right to payment of principal and interest upon a certain demand note for $50,000, but such waiver was expressly made without prejudice for them to assert claims in the event of receivership or bankruptcy of said corporation. From that day on petitioners were divested of all control and authority. They were replaced by the board of managers and were not even permitted to enter the premises of the corporation. The corporation's financial condition grew progressively worse to and including December 31, 1947. The corporation's assets had a fair market value of $75,000 as of December 31, 1947, as distinguished from their book value of $243,006.38 as set forth in the balance sheet *159 attached to the 1947 corporate income tax return. Its liabilities, exclusive of the $50,000 note and capital stock, amounted to $164,837.47. Total corporate liabilities, including the $50,000 note, were $214,837.47. Although petitioners received no salary, the corporation operated at a loss of $52,916.27 for the year 1947. On March 25, 1948, a form letter was sent to the creditors of the corporation in the nature of a report advising them that a contract for the sale of the assets and the assumption of the $88,000 first mortgage had been signed on March 20, 1948, which would result in a cash payment of about $57,000 to the bakery. The letter further stated that after deducting $14,050 to pay accrued taxes with interest and penalties and $7,500 to pay off chattel trusts and conditional sale liens there would be sufficient funds left to pay 80 cents on the dollar to the trade creditors. It was stated that there would be no recovery by the petitioners on the corporation's note of $50,000 held by them. The creditors were requested to consent to the sale and to accept 80 cents on the dollar in full satisfaction of their claims. All of the trade creditors consented to this arrangement. *160 Distribution of all the proceeds of the sale was made without any recovery of any amount by petitioners on any part of their investment or loan. On March 25, 1948, petitioners entered into an agreement with Harry Mayer whereby he cancelled petitioners' $130,000 note in return for petitioners' payment to him of $9,500 and their consent to the transfer to him of the common stock and the corporation's $50,000 note payable to petitioners. The common stock of Sheridan Bakery, Inc., became worthless in 1947. Opinion ARUNDELL, Judge: In their respective income tax returns for 1947 each of the petitioners deducted $10,000 as a loss resulting from the worthlessness in that year of the common stock of the Sheridan Bakery, Inc. Respondent having determined that the stock did not become worthless in 1947, disallowed the deductions. In order to overcome the presumptive correctness of respondent's determination, the petitioners must prove that some "identifiable event" occurred in 1947 which made the stock worthless at that time. An identifiable event has been defined as an incident or occurrence that points to or indicates a loss - an evidence of a loss. . *161 In the case at bar, the creditors of petitioners were informed in a letter dated December 12, 1947, that with their consent the corporation proposed to replace petitioners as managers of the business and to make strenuous efforts to find a purchaser for the business in an attempt to have the creditors paid in full. The letter further referred to the financial difficulties of the bakery and requested a six month extension of the creditors' claims. In a letter dated November 9, 1947, to Phillip W. Knapp, the attorney for a preferred stockholder, petitioner Camp renewed a previous offer to sell the assets, stating, "our investment will be wiped out." Although no receiver was officially appointed, a preferred stockholder who had filed a derivative suit in the United States District Court against the corporation and petitioners filed a motion for the appointment of a receiver pendente lite. In return for the withdrawal of that motion, petitioners consented to be replaced by the former owner and accountant of the corporation in its management. We think the evidence clearly shows that petitioners were prepared to throw in the sponge in 1947. We think the incidents set forth above are *162 "identifiable events" unmistakably pointing to and indicating a loss in 1947. The requirement that losses be deducted in the year in which they were sustained calls for a practical, not legal, test. . Here, the corporation decided in 1947 to liquidate and so notified its creditors. It was insolvent and unable to meet its obligations in 1947. The controlling stockholders were replaced in the management of the business to avoid a threatened receivership in 1947. Petitioners in 1947 lost all hope of recovering their investment. The stock had neither actual nor potential value. Respondent contends that the stock had substantial liquidating value as of December 31, 1947. In support of that contention, he points to the balance sheet attached to the bakery's corporate return for 1947 showing assets of $243,006.38 and liabilities of $214,837.47 as of December 31, 1947. While the book value of the assets as set forth in those balance sheets may be regarded as evidence of their value, we think it clear from the record that those book values were highly inflated. Petitioners made every effort to sell the assets in 1947 and received only one offer *163 in the amount of $75,000. That this was not an unreasonable valuation is evidenced by the fact that only about $57,000 in cash was received by the corporation from the sale of its assets in early 1948, the balance of the consideration of $145,000 being the purchaser's assumption of the mortgage on the plant, amounting to approximately $88,000. Where the facts make it clear that book value is at variance with actual value, the book value will be disregarded. . On December 31, 1947, the liabilities of the corporation, excluding the $50,000 note held by petitioners, amounted to $164,837.47. We are convinced that the liabilities as of December 31, 1947, far exceeded the fair value of the assets and that the stock had no liquidating value. Respondent further argues that in addition to liquidating value, the stock had substantial potential value as of December 31, 1947. He bases this argument primarily on certain letters written in November, 1947, by petitioner Camp to prospective purchasers of the assets of the bakery describing the business in rather glowing terms. The letter stated that the assets were valued at $349,779.88 and exceeded *164 liabilities by $175,669.99. It was further stated that the corporation was a going concern doing over $10,000 weekly business and that the plant was equipped to do $1,500,000 yearly business. We know, of course, this did not tell the whole story since in fact the business was insolvent and losing about $5,000 per month. Petitioners were merely exhibiting the "puffing" at times indulged in by sellers. Respondent cites the case of , as authority for his statement that it is well established that no deductible loss may be taken by one who owns stock in a going concern. As we understand that case, the decision was based on the corporate management's belief that they would ultimately work out of their business difficulties and realize profits. No such belief existed in the situation under consideration here. The only purpose in continuing the operation of the business beyond the end of 1947 was the preservation of the salability of the assets. In holding that certain stock became worthless in 1931 rather than in 1932, the year of the liquidation of the corporation, we said, in , *165 affirmed , "There is nothing in the record * * * to indicate that any officer or director of the corporation had a hope or expectation that a continued operation of the corporation would result in creating an equity for the holders of its common stock, much less that such a hope and expectation was reasonable under the circumstances." In , the stockholders voted in March, 1922, to sell the corporate assets for not less than $75,000. The corporation continued to operate at a loss beyond the end of 1922. No offer was received until 1923 and the property was not finally disposed of until 1925. In holding the stock had become worthless in 1922, we said that "Events occurring subsequent to 1922 merely confirm the worthlessness of the stock in that year." We find no merit in the respondent's further contention that the petitioners resold the stock on March 25, 1948, for a valuable consideration to Harry Mayer from whom they had originally purchased it. The record clearly shows that the stock was placed in escrow upon its sale by Mayer to petitioners as security for the interest and principal payments on the purchase *166 money note for $130,000. That note expressly provided that upon default in the payment of any installment of interest or principal, the escrow agents could dispose of the stock. Petitioners defaulted after a 30-day extension on the interest payment due November 1, 1947. On March 25, 1948, petitioners signed an agreement with Harry Mayer which provided that the $50,000 note of the bakery payable to petitioners should be turned over to the escrow agents for whatever disposition Mayer should direct. It further provided that the escrow agents should turn over the common stock to Mayer and that petitioners should pay $9,500 to Mayer who would then cancel petitioners' $130,000 note. We think it clear that the only valuable consideration for the cancellation of the $130,000 note was the payment of $9,500. This agreement was made after the execution of the contract for the sale of the assets to Giant Food Shopping Center, Inc. In order to induce the bakery's creditors to accept payment of 80 per cent of their claims in full settlement, petitioners had publicly announced that they would not seek to recover on the bakery's $50,000 note. As to the stock, when petitioners defaulted on the November, *167 1947, interest payment, their only right in that stock was to receive any excess over $130,000 received by the escrow agents for the sale of the stock. Obviously then, neither the $50,000 note nor the common stock represented valuable consideration passing from petitioners to Mayer. Respondent's final contention is that if the stock did in fact become worthless in 1947, the losses sustained by petitioners are subject to the capital loss limitation prescribed in section 117 of the Code. This point is conceded by petitioners. Since the common stock of Sheridan Bakery, Inc., became worthless in 1947, it follows that respondent erroneously disallowed deductions by petitioners of the losses resulting therefrom. Decision will be entered under Rule 50.